BAGLIN et al. v. CUSENIER CO.

(Circuit Court of Appeals, Second Circuit. August 3, 1908.)

No. 230.

TRADE-MARKS AND TRADE-NAMES — INFRINGEMENT—UNFAIR COMPETITION—INJUNCTION.

For many years the order of Carthusian Monks established at La Grande Chartreuse, in France, made and sold a liqueur, claimed to have been made by a secret process, which became widely known as "Chartreuse" throughout the United States, where such name is also registered as a trade-mark. The order having been expelled from France by the government, its entire property, including its distillery, products, good will, and trade-marks, were sold to defendant by a receiver under an order of the courts, and defendant, although having no knowledge

of the secret formula, commenced the manufacture of a similar liqueur, which it sold under the same name, using the same bottles formerly used by the monks and the same labels, which contained a signature and certain symbols peculiar to the order. In the meantime the monks established a factory at Tarragona, Spain, where they continued to make and sell the liqueur in accordance with the original formula, using, however, a different label and style of package. *Held*, that the action of the French government and courts did not vest defendant with the right to use the name and labels of the monks in the United States, and, while it had the right to state on its labels the place where its liqueur was made, it would be enjoined from doing so without accompanying words stating the facts and clearly distinguishing its liqueur from that manufactured by the monks, and from imitating the original labels in such manner as to mislead purchasers.

Noyes, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Southern District of New York.

See 156 Fed. 1019.

The Circuit Court adjudged: (1) That the word symbol "Chartreuse," as applied to liqueur, is a good and valid trade-mark in this country and has been and now is the sole and exclusive property of the Carthusian Monks, who are the complainants herein, and that the label as set forth in the United States trade-mark certificate No. 3,377 constitutes a valid trade-mark in this country. (2) That the defendant has been guilty of unfair competition and has infringed said trade-mark by importing into this country liqueur not made by the complainants but bearing the said labels and trade-marks. (3) That the defendant be perpetually enjoined from using in this country, or in any possession thereof, in connection with any liqueur not manufactured by the complainants, the trade-mark, "Chartreuse" or the fac simile signature "L. Garnier" or any of the trade-marks above referred to. (4) That the usual accounting of defendant's profits be had.

A preliminary injunction granted by the Circuit Court (156 Fed. 1015) was modified by this court (141 Fed. 497, 72 C. C. A. 555). The opinion below is reported in 156 Fed. 1016.

See, also, Bauer & Co. v. Carthusian Monks, 120 Fed. 78, 56 C. C. A. 480.

A. L. Pincoffs, Hubert Howson, and Charles Howson, for appellant.
Philip Mauro, C. A. L. Massie, and Ralph L. Scott, for appellees.

Before COXE, WARD, and NOYES, Circuit Judges.

COXE, Circuit Judge (after stating the facts as above). The principal facts are found in the prior opinions, supra, and need not be repeated. We think, however, that the statement of the circumstances which resulted in the complainants leaving France and setting up their distillery at Tarragona, Spain, requires some additional recital of the facts. The defendant, at the time the answer was filed, was the agent in the United States of the receiver of the complainants'

property, appointed by the French courts. Whatever title the receiver acquired the defendant acquired, whatever rights the receiver had the defendant has. The same is, of course, true of the present owner, the Compagnie Fermière de la Grande Chartreuse.

On July 2, 1901, the French associations law was promulgated. With the intent and purpose of this measure we have nothing to do. The lawmakers deemed it necessary for the perpetuity of the Republic and it has been upheld and enforced by the courts of France. Pursuant to this law, on March 31, 1903, the court of first instance of Grenoble dissolved the order of Carthusian Monks, sequestered its entire property and appointed M. Lecouturier receiver. On April 23, 1904, the same court, in an action between the receiver and Abbé Rey and others, adjudged that the business of manufacturing liqueurs at the Grand Chartreuse, including the good will, clientage, trademarks, commercial names, models of bottles, flagons, cases, furniture, machinery, raw material, manufactured goods and the exclusive right to the industrial name L. Garnier, was the property of the monks and passed to the receiver to be liquidated. This judgment was affirmed by the court of appeals of Grenoble and the appeal to the court of Cassation was dismissed. It thus appears that, when this action was commenced, every right and title which is in dispute here, every item of property claimed by the complainants, whether corporeal or incorporeal, tangible or intangible, were, so far as France is concerned, vested in the receiver who is represented by the defendant. The acts which the complainants seek to restrain were lawful in France, the liqueur being manufactured, bottled and labeled at the Grand Chartreuse, and sold under sanction of French law. Such a bill as we are now considering would not stand for a moment in any court of France. Of this there can be no question.

The situation as to the monks is also anomalous. Had they chosen to do so they could, with some necessary changes, have used the old labels and trade-marks in Spain, but they have seen fit not to do so, probably because the labels would have been prohibited in France and they would thus have lost the French market. They could not have used the trade-mark in the form as registered, for it would have been a falsehood and a fraud on the public to assert that liqueur made at Tarragona, Spain, was "Fabriquée à la Gde. Chartreuse" in France. Especially would this be an unfair statement in view of the oft repeated assertion of the complainants that their liqueur derived its peculiar excellence from the plants and herbs grown in the Alps in the vicinity of their monastery. However this may be, the Monks, since establishing themselves at Tarragona have de facto, though not de jure, abandoned the old labels and insignia. Their object seems to be to depart as far as possible from the former methods of dressing up their goods. One of their advertisements, containing a picture of their new bottle with labels attached, is as follows:

"The Peres Chartreux dispossessed in France of their old trade-marks, sold at auction, have carried away their secret and manufacture at Tarragona. Demand this new bottle in asking for the 'Liqueur of the Peres Chartreux' (Tarragone) or simply 'A Tarragone.'"

Their new labels and marks are totally different from the old ones and they have been particular to caution the trade that no liqueur is genuine unless bearing the new label. Their agent's circular states:

"While formerly the Liqueur derived its name from the monastery of the La Grande Chartreuse, circumstances have rendered it necessary, under the new conditions, to name it 'Liqueur Peres Chartreux' after the order of monks owning the secret process employed in its manufacture."

Assuming the right of the complainants to use the old trade-marks, it is manifest that they have not used them since their departure from France, do not wish or intend to use them and, should they do so, it would still further complicate the situation and vex the trade, with no corresponding benefit to any one. The complainants have established a new demand for their liqueur under the new labels, purchasers have learned to recognize the monks' goods by these labels and it would exhibit a lamentable lack of business sense for them to return to the old label, even if they could do so legally and truthfully.

It will be observed that at no time have the complainants designated their liqueur as "Chartreuse" on any of their paper labels. That name has been used by them principally when advertising the fact that their liqueur was "made at the Grand Chartreuse," in the same way that they now say it is made at Tarragona. There can be little doubt, however, that the name in time came to indicate the liqueurs made at the monastery in the French Alps by the monks residing there. It may be doubted whether, in this country at least, the name indicated any particular order of monks. Its primary meaning was undoubtedly geographical but it acquired afterwards a secondary meaning, so that a purchaser prior to 1901 ordering a case of "Chartreuse" would expect to receive liqueur made by monks at the French monastery.

It is not easy to believe that a person, familiar with all the facts relating to the migration of the Carthusians to Spain, could be deceived by the labels at present used by the defendant. The bill alleges on information and belief that since the removal of the complainants from France, certain persons without the complainants' consent have made a spurious imitation article falsely representing that it is made pursuant to the famous recipe of the complainants and that the defendant has imported large quantities of the spurious article, under the trade-marks and labels still owned exclusively by the complainants, and has sold the same to the American public. All this the defendant denies. The writer is of the opinion that as the complainants have alleged that the defendant has deceived the public by palming off a spurious liqueur for the genuine article, it is incumbent upon them to prove the accusation.

It is, of course, unfortunate for the complainants that their liqueur is made under a secret formula which, naturally enough, they decline to disclose; but without such disclosure we are unable to say with any degree of certainty that the two liqueurs are not substantially alike. A charge that defendant is perpetrating a fraud must be established by something more than opinions and conjecture, and es-

pecially is this true, where the party upon whom the burden rests has it in his power to establish fraud, if it exists, by proof which it will be practically impossible to contradict. We intend no criticism of the complainants' course in this regard. It is undoubtedly more profitable for them to maintain secrecy, and they are under no obligation to do otherwise. But they cannot complain if the court is unable to find that the defendant's liqueur is materially different from theirs without knowledge of its ingredients and the process by which they are combined.

It is true that experts called by the complainants denounced the defendant's liqueur as exceedingly bad, so bad in fact that the veriest tyro cannot be mistaken and yet, when asked to make the test in the presence of the commissioner they invariably declined. One of these, M. Dubonnet, testified as follows:

"Q. You could make sure of distinguishing this liqueur from the real Chartreuse? A. I do not know if I ought to reply. I have tested liqueurs enough; but one can be deceived. When I taste I taste calmly, wisely, I take precautions. Q. Will you make the experiment now? * * * A. No, because it is very delicate."

Another witness, M. Brezun, testified:

"Q. Do you consider yourself capable of distinguishing the Chartreuse made by the Carthusians from those made by the imitators? A. Certainly. Q. Will you give a proof of it at once? A. No, it is necessary to do that in the quiet of the office, when resting, with due consideration; that cannot be done in the state of nervousness in which I am at present."

It would seem, therefore, that the discovery of the difference between the two liqueurs is a grave and formal ceremony requiring the exercise of quasi judicial functions, which cannot be invoked amid the disturbing influences which usually surround the post-prandial consumption of Chartreuse. The proof of actual deception is exceedingly unsatisfactory. The facts regarding the migration of the monks to Tarragona and their adoption of entirely new labels is so well known that no one connected with the trade could be deceived. The consumer might be, but the assertion that he has been depends more upon presumption than fact.

We are thus confronted with a situation which is sui generis, it differs on the facts from all reported cases and it is hardly possible that such a combination of abnormal circumstances can ever occur again. What the defendant is doing is perfectly lawful in France. It has a right to make the liqueur, call it "Chartreuse" and sell it under the old labels. All this is not only permitted but it has the affirmative sanction of French law. The complainants, so far as the United States is concerned, have a right to do what they are doing and whatever good will pertaining to the old business remains in this country, should be conserved.

Lastly, the rights of the public are to be considered; they are entitled to protection from simulation and fraud. In the recent case

of Siegert v. Gondolfi, 149 Fed. 100, 79 C. C. A. 142, this court said upon somewhat similar facts:

"Undoubtedly the Siegerts did not, and could not, acquire such a monopoly in a geographical name as a trade-mark or trade-name as would entitle them to prevent others from using it under any circumstances. But it is sufficient to entitle them to relief that they used the name lawfully to designate their product until it became known to the trade by that designation, that by doing so they acquired a trade which was valuable to them, and that their business is being injured by acts of the defendants which create a dishonest competition by leading the public to believe that Abbott's Bitters are the original bitters."

Although, as before stated, there is inadequate proof of deception we cannot close our eyes to the fact that the use of the old labels alone might easily induce a purchaser, seeking the monks' cordial, to take defendant's instead. The old labels indicate to one who had long dealt in the old cordial that it was made not only at the Grand Chartreuse but also that it was made by the monks. The last representation is not expressed in so many words, but is a reasonable and fair implication from the long association of the label with the monks' product. A purchaser is compelled to rely upon external appearances and if he wanted the monks' product he would be justified in thinking he had procured it if the bottle were identical in appearance with that which contained the liqueur of years ago when he first became acquainted with it.

The defendant is the successor of the liquidator who was appointed by the French court and acted pursuant to its decree, he should not be treated as an ordinary pirate seeking by fraud to divert a legitimate business. The common sense solution of the problem, it seems to us, is to compel both parties to tell the truth about their goods. There is no false statement on either the complainants' or defendant's labels as now printed, but the use of the old labels and insignia are, to say the least, misleading. If the defendant desires to sell its liqueur on its merits there is no excuse for using labels of the same size, shape and color as the old ones with the signature, L. Garnier, the stars, the orb and the cross.

On the other hand, the defendant having acquired the right to manufacture liqueur at the Grand Chartreuse, or at Fourvoirie within the demesne of the convent, should not be debarred from whatever advantage may flow therefrom. There can be no doubt that, based partly on fact and partly on the statements of the monks, there is a general belief that the plants which grow in the Alps in the vicinity of the convent possess peculiar qualities and have an aroma indigenous to that locality. To deprive defendant of the right to mention the locality of its distillery is to deprive it of a substantial right. This right was recognized in the English case—which on appeal went strongly against the defendant—the court saying in substance that the use of the word "Chartreuse" should be enjoined if used "without clearly distinguishing the liqueurs so sold from the liqueurs manufactured by the plaintiffs."

We see no reason why the defendant should not be permitted, for instance, to use a label, printed in any language, in the following words:

LIQUEUR

Made by The

COMPAGNIE FERMIÈRE

de la

GRANDE CHARTREUSE

at Voiron

FRANCE.

Or as follows:

LIQUEUR

made at

The

GRANDE CHARTREUSE

by the

COMPAGNIE FERMIÈRE

successor to

M. LECOUTURIER, LIQUIDATOR

of the property of

the

CARTHUSIAN MONKS.

The foregoing forms are suggested, tentatively, to illustrate the labels which, in our opinion, the defendant may legally use. We do not, however, intend to be understood as intimating that the defendant should be limited to such use. So long as the purchaser is clearly made to understand that the liqueur is not the product of the monks no injury is done to the complainants. If the old labels and symbols

are abandoned we see no reason for compelling the defendant to change the shape of its bottles.

Paragraph No. 4 of the decree should be amended as follows: After the word "thereof" in line 9 (as printed on page 1568) add the following:

"Unless so used as clearly to distinguish such liqueur or cordial from the liqueur or cordial manufactured by the complainants."

In line 20 strike out the words "bottle or" and in the same line substitute the words "symbol" for the word "package" and in line 21 after the words "similar to" insert the words, "those appearing on."

The decree as amended, is affirmed without costs to either party in this court.

WARD, Circuit Judge, concurs in the result.

NOYES, Circuit Judge (dissenting). While my ultimate conclusions with respect to the decree are not in practical effect widely at variance from those of Judge COXE, the course by which I reach them is so essentially different as to require its separate presentation. An orderly examination of the questions in the case may proceed along these lines: (1) The trade-mark "Chartreuse." (2) The status and property rights of the Congregation of the Chartreux in France prior to 1901. (3) The proceedings under the association act of 1901 and their effect upon the business and trade-marks of the Congregation in France, including trade-mark rights. (4) The property rights of the Congregation in the United States. (5) The use by the defendant of the Congregation's labels and symbols.

1. For hundreds of years the establishment of the Peres Chartreux (Carthusian Fathers) was in the valley of the Chartreuse, in Dauphine, France. Whether the order originally took its name from the valley or the valley from the order is not entirely clear. But it is certain that when, some years prior to the French Revolution, the monks began to distill a liqueur for their own use the convent was known as "La Grande Chartreuse." The order was expelled from France at the time of the Revolution, but returned in the early part of the last century, and some years afterwards began to sell the liqueur which they manufactured. The liqueur was manufactured by the monks at a place near the monastery according to a secret formula which has never been divulged; but, while all the constituents are not known, it is certain that plants growing in the vicinity of the monastery were used. In fact, the monks always contended that the use of the plants grown in this region gave the liqueur much of its peculiar excellence. The liqueur was favorably received by the public. The monks composing the Congregation of the Chartreux built up and carried on an extensive business in its manufacture and sale. It was consumed all over the world.

It does not appear that any distinctive name was ever applied to this liqueur by the monks. The labels upon the bottles, however, bore the description: "Liqueur fabriquée à la Gde. Chartreuse." The public undoubtedly abbreviated this phrase to "Chartreuse." By that name

the liqueur became known, and it was applied to it for so many years that it became its trade-mark. The trade-mark "Chartreuse" thus had its origin in the name of the place where it was made—La Grande Chartreuse—and it continued to designate the place. It was also identified with that region by the belief—which, as we have seen, was fostered by the monks—that the liqueur owed many of its valuable qualities to the plants found there. But the trade-mark "Chartreuse" was more than a place name. It identified in the public mind a liqueur made by the Carthusian monks—by the Congregation of the Chartreux. The trade-mark in the one word "Chartreuse" designated both the manufacturer and the place of manufacture. Whether it came to stand for the one more than for the other is not important. It never, in my opinion, wholly lost its double signification. And even if the name "Chartreuse" had acquired a secondary meaning as designating the manufacturers—the Congregation of the Chartreux—and not the place, it was none the less a trade-mark belonging to such manufacturers and capable of transfer.

Thus we come to the year 1901 and have this situation: The Carthusian monks—Congregation of the Chartreux—at La Grande Chartreuse were carrying on an extensive business in the manufacture and sale of the liqueur designated by the valuable trade-mark "Chartreuse."

2. Prior to the French Revolution the order of Carthusian Monks composing the Congregation of the Chartreux undoubtedly owned their monastery and the adjacent territory. But at the time of the Revolution, in 1793, this Congregation, with all other religious societies in France, was suppressed, and it never had any legal organization as a corporate body afterwards. The monks were also expelled from France at that time. They returned, however, in 1816, and occupied the domain of La Grande Chartreuse as before, with the permission of the government, but without any legal title. They applied for authority to exist as a religious corporation, which would have given them the right to hold property, but this was denied. The position of the Congregation, therefore, after its return to France and until 1901, was that of an unauthorized religious association existing by the toleration of the government. It had no legal authority to hold property, real or personal; and yet it did hold property, and, as we have seen, built up an extensive manufacturing business, with the acquiescence of the government. Its legal situation was that of a de facto religious corporation or society, with an appurtenant manufacturing business.

In 1901 the associations law—as it is designated—was passed. This law made no change in the legal status of the Congregation. It did not, strictly speaking, confiscate its property, because the Congregation had no authority to hold property. It did, however, withdraw the toleration under which the Congregation had existed as a de facto society and provided for the appointment of liquidators to wind up its affairs. This act is said to be based upon the traditional law of France that a Frenchman shall not part with his right to own property or to marry, with which the monastic vows of "poverty, chastity and obedience" are in conflict. Its obvious purpose and effect—whatever its basis—was to force the Carthusian Monks and other similar orders out

164 F.—3

of France. But it is not within our province to discuss the justice, wisdom, or policy of the law.

3. After the passage of the act of 1901 the Congregation of the Chartreux applied to the present government of France, as it had done to the government of the Restoration, for authorization to exist as a religious corporation. This authority was, however, denied, and in March, 1903, M. Lecouturier was appointed under the provisions of the act by a court of competent jurisdiction liquidator of "the properties of the so-called Congregation of the Chartreux, both the properties situated and held at the main house at St. Pierre des Chartreuse, and also those held by the said Congregation in its different establishments." At the time of this decree, however, the Congregation of the Chartreux disclaimed ownership, as an association or society, of the trade-mark "Chartreuse" and the business connected with the manufacture of the Chartreuse liqueur, and claimed that they were the property of a former procureur of the order, Father Rey, who had been secularized for the purpose of holding them. The liquidator, however, instituted proceedings against Rey, as a result of which it was determined by the highest French courts that he was merely an interposed person or passive trustee, and that the property transferred to him in fact belonged to the Congregation of the Chartreux, and constituted part of the assets to which the liquidator was entitled. The decree in this case, which is of the utmost importance as affording the basis of the rights of the parties, is as follows:

"Declares that the business of the manufacture of liqueurs, cordials, and other products exploited at the Grande Chartreuse and at Fourvoirie under the commercial name of 'Liqueur Manufactured at the Grande-Chartreuse,' 'Vegetable Elixir of the Grande-Chartreuse,' and 'Products of the Grande-Chartreuse' including the good will and clientelage, the ownership of the trade-marks and commercial names used to designate such products, * * * and all other accessories and appurtenances generally whatsoever belonging to the aforesaid business which were the object of the deed of transfer * * * [to Rey] * * * is property held by the order, * * * and that such property forms part of the assets to be liquidated."

Attempts have been made to secure interpretations of this last decree upon the point whether it embraces foreign trade-marks; but the French courts have declined to interpret it, and it must be taken as it stands. The question, then, is this: What was the effect of these decrees upon the business and trade-marks of the Congregation?

It is contended, in behalf of the complainant, that when the monks left France they took their business and the trade-marks attached to it with them; that all the liquidator obtained was the tangible property which they left behind—"the bricks and mortar of the distillery." This contention, although supported by high authority, seems to me not well founded. Had the monks moved their establishment out of France before the appointment of a liquidator, it may be that he would have obtained nothing more than the tangible property which was left. It may be that a manufacturer can move his business from one country to another, so that a receiver of his property will take nothing but the factory and the machinery remaining in it. I do not find it necessary to determine these questions. In this case the monks did not attempt

to take their business away with them. Before the decree appointing the liquidator was entered they had transferred the business, good will, and trade-marks to Father Rey. With respect to the liquidator he held them merely as trustee for the Congregation; but as between him and the Congregation the technical title at least had passed. The monks cannot be said to have taken away their business and its incidents after the conveyance to Father Rey. To what extent the title passed—how far Rey was accountable—need not be considered. It is sufficient to say that the Congregation by the conveyance to Rey placed the title to the business, good will, and trade-marks in such situation that they could be appropriated by the liquidator. The liquidator attempted to appropriate them; Rey, with the aid of the monks, contested the liquidator's demands; and the court, having jurisdiction, decided that they belonged to the liquidator. I can reach no other conclusion than that the trade-mark "Chartreuse" and the manufacturing business to which it was an incident, so far as France is concerned, passed to the liquidator and that, as said by Judge COXE:

"Such a bill as we are now considering would not stand for a moment in any court of France."

4. The examination of the case thus far necessarily brings us to the conclusion that, unless the Congregation of the Chartreux had an independent business in this country to which the trade-mark "Chartreuse" could be considered an incident, the bill for infringement of trade-mark cannot be sustained. If the trade-mark, so far as the United States is concerned, passed with the transfer in invitum of the business in France, the complainant cannot base any demands upon it. Now there is this distinction, which differentiates this country from other countries where the right of the monks to protection in their trade-marks has been recognized notwithstanding the proceedings in France, and that is the difference in trade-mark registration laws. It may well be that, where such laws confer property rights upon the owners of a trade-mark similar to those conferred by our patent or copyright statutes, the French decree and the transfer of the French business would not affect the registered trade-marks. But our trade-mark act confers no such rights. It merely brings pre-existing property rights within the cognizance of federal courts in certain instances, but in no sense confers such rights. Sarrizin v. W. R. Irby Cigar & Tobacco Co., 93 Fed. 624, 35 C. C. A. 496, 46 L. R. A. 541, and cases there cited. The registry of the trade-marks in this country in the name of Grezier, procureur, therefore, neither adds anything to, nor takes anything away from, the complainant's case.

What property rights, then, did the Carthusian Monks have in this country? What business had they here to which the trade-marks were an incident? It is not contended that they had any tangible property here. It is not claimed that they manufactured any of the liqueur here. The most that appears is that their manufactured product had been sold in this country for many years through the agency of the firm of Batjer & Co., of New York. But their methods of doing business are not shown. In view of the fact that the witness Batjer speaks of his "profits" and of his expenditures for advertising, it

would seem probable that his firm had the exclusive right of purchase of the monks' products from their European representative, rather than that they were agents upon a commission basis—in other words that the liqueur sold by Batjer & Co. belonged to that firm upon its arrival in this country. Be that as it may, I find nothing in the record showing that the monks had any such separate business in this country that a good will attached to it as distinct from the good will of the business in France. The manufacturing business was located in that country alone. The good will attached to it there, and I know of no principle upon which such good will can be divided and subdivided. If the Carthusian Monks have property rights in this country in the name "Chartreuse" unaffected by the French decrees, then every American manufacturer shipping goods to foreign countries who goes into bankruptcy and whose business and trade-marks are sold still retains property rights in such trade-marks abroad and may prevent their purchaser from engaging in foreign trade.

It is my opinion that the business of the Congregation of the Chartreux was located in France, that the good will followed the business, and that the trade-mark "Chartreuse" followed as an incident to the good will. I am convinced that, had the Congregation sold its business and used language much more limited in scope than appears in the French decrees, the trade-mark "Chartreuse" would have passed with it for all the world; and I see no difference between a voluntary conveyance and a transfer by operation of law—especially a transfer in connection with a voluntary conveyance, that to Father Rey. For these reasons, and with reluctance in view of the nature of the case and of the high authorities holding contrary views, I am of the opinion that the Carthusian Monks—Congregation of the Chartreux—are not entitled to relief based upon their ownership of the trade-mark "Chartreuse."

This is as far as it is necessary to go in this part of the case. The complainants must recover by the strength of their own title, and not by the weakness of the defendants. If the Carthusian Monks have lost their rights to the trade-mark, it is not material here whether the liquidator and his assignee—the Compagnie Fermière de la Grande Chartreuse—are using the trade-mark properly or not. It would not help their case that the liquidator had acquired a trade-mark which he could not lawfully use. It would not aid them if the court should be of the opinion that a deception was being practiced upon the public by describing as "Chartreuse" a liquid obtained only through the use of the sense of taste and "groping in the dark." If the public are being deceived, the courts will never afford affirmative relief to the defendant, and possibly public remedies against it might be available. But no wrongful use of the trade-mark entitles the complainants to relief if they have lost all rights in it.

It is, I think, a theory wholly without foundation that there could have been no separation of the trade-mark "Chartreuse" from the secret formula; that, as the liquidator failed to acquire the formula, he could not legally have acquired the trade-mark. The formula was either indispensable or unnecessary for the preparation of the product

to which the trade-mark could truthfully apply. In the one case it is manifest that the liquidator could, in the absence of the formula, manufacture the product and use the trade-mark without deceiving the public. In the other he would simply have acquired property of which he could make no use until he obtained the formula. But he would have owned it none the less. It would no more have reverted to the complainants than would one of the trade-marks of a proprietary medicine business revert to its vendors because its formula was lost or mislaid, or because an employé possessing exclusive knowledge of the secret process refused to disclose it. As already indicated, the absence of the formula relates rather to the weakness of the defendant's case than to the strength of the complainants'. It may well be that neither the complainants nor the defendant have now the right to use the trade-mark "Chartreuse"—the complainants, because it has been taken away from them by legal process; the defendant, because it cannot be used without deceiving the public. But the defendant's situation does not benefit the complainants here.

5. But while, in my opinion, the trade-mark "Chartreuse" passed to the liquidator and his assignee, it does not follow that the symbols of the orb and the cross upon the labels likewise passed and gave such assignee the right to use them upon its products. Such symbols are of a religious nature, are distinctly personal to the monks, and could not be taken from them. The fact that the liquidator seized certain labels and had others printed gave him no right to use the religious symbols of the monks. And this is true in less degree of the stars, and of the signature of the officer of the order, "L. Garnier." Unlike the trade-mark "Chartreuse," these symbols and name are personal to the monks, and they should be protected from their misappropriation and use by the defendants. I cannot adopt the view that the Compagnie Fermière de la Grande Chartreuse could acquire the right to use these symbols.

For these reasons I am of the opinion that the decree of the Circuit Court should be so modified as to restrain the defendants only from using the said symbols and the name "L. Garnier," and should not relate to the use of the trade-mark "Chartreuse." In reaching this conclusion, however, I am not unmindful of the fact that the opinion of the majority of the court in requiring each party to tell the truth not only does exact justice between them but protects the public from deception. The result is so equitable that, were it not for my inability to appreciate the complainants' standing to obtain such a decree, I should concur in it.