HEROLD et al. v. HEROLD CHINA & POTTERY CO.

(Circuit Court of Appeals, Sixth Circuit. February 7, 1919.)

No. 3155.

1. INJUNCTION ⊜56—RIGHTS PROTECTED—SECRET FORMULAS AND PROCESSES.
    Secret formulas and processes are property rights, which will be protected by injunction, not only as against those who attempt to disclose or use them in violation of confidential relations or contracts, express or implied, but against those participating in the attempt with knowledge of such relations or contracts, though they might in time have reached the same result by independent efforts.

2. INJUNCTION ⊜128—DISCLOSURE OF TRADE SECRETS AND PROCESSES—EVIDENCE.
    In suit by a pottery company to enjoin use of its trade secrets and processes by defendants, its former manager and a competing company, evidence as to disclosure of trade secrets and processes by the manager *held* insufficient to sustain decree for plaintiff; there having been no disclosure in evidence of what each party claimed as a trade secret.

Appeal from the District Court of the United States for the Southern District of Ohio; John E. Sater, Judge.

Suit in equity by the Herold China & Pottery Company against John J. Herold and the Guernsey Earthenware Company. From a decree for plaintiff, defendants appeal. Reversed, except so far as enjoining defendant company in a certain particular.

Charles Koonce, Jr., of Youngstown, Ohio, and Fred L. Rosemond, of Cambridge, Ohio, for appellants.

Ezra Keeler, of Denver, Colo., for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and COCHRAN, District Judge.

KNAPPEN, Circuit Judge. Appeal from a decree enjoining the disclosure or use of alleged secret formulas, and for an accounting.

Herold, a skilled potter of ten or more years' experience in Ohio, went to Colorado in the year 1909, on account of a tubercular affection, and there erected a small factory for making high-grade chinaware. He lacked capital, and after about three years' effort turned over his entire plant and formulas to the plaintiff company, in consideration of his employment and certain stock to be given him. It was at first thought that but little capital would be required, but the requirements increased from time to time until about $47,000 had been contributed by the Golden parties by way of stock subscriptions and $26,000 in the form of loans. In 1914 the Golden product had acquired a high reputation. Professor Fleck, of the Colorado School of Mines, located

at Golden, had found its chemical or laboratory ware equal to Royal Berlin ware, and had substituted the former for the latter. It seems to have been recognized, so far as it was known, as the highest grade of porcelain ware commercially made in America, and Herold as the expert maker of it.

The Guernsey Company had a large plant at Cambridge, Ohio, and was a wealthy and prosperous concern. It had successfully made high-fired china, especially that used for baking, such as casseroles, in which a red or brown body is lined with porcelain; the entire dish being then covered within and without with a glaze. It had also been for some time actively experimenting with white china and laboratory porcelain bodies, and had made some samples. It was perhaps close to the line of success, but seems not to have crossed it, at least so far as commercial production is concerned. In December, 1914, it employed one Frauenfelter, before then employed in a pottery at Roseville, Ohio. Frauenfelter seems to have recommended the employment of Herold, with whom Frauenfelter had been associated at Roseville before Herold went to Colorado. Herold had become dissatisfied with his relations with the plaintiff company; and, after finding that his resignation as general manager was satisfactory to plaintiff, and being given the position merely of modeler, designer, and decorator, although at the same salary, he in December, 1914, came to the Guernsey Company as factory superintendent, in complete charge of manufacturing, but without impairing the authority of the general manager. At the end of five years' performance Herold was to have 20 shares of the Guernsey Company's common stock, dividends thereon to be meanwhile paid him in addition to his salary, which was 60 per cent. larger than paid by plaintiff. There came with, or followed, Herold from Golden two or more of plaintiff's other skilled employés. Herold stayed with the Guernsey Company until the following May, when he retired and went to a pottery at Zanesville, Ohio, where Frauenfelter also went. On retiring, he conveyed to the Guernsey Company, for an expressed new consideration of $500, a so-called "Semmler" formula for making porcelain ware, which defendants claim Frauenfelter had obtained from one Semmler, of Derry, Pa., and had given to Herold while the latter was in the Guernsey Company's employ.

This suit was begun January 27, 1915. It was heard, not only on depositions taken in different parts of the United States, but on oral testimony consuming five days. The prominent issues were, first, whether the secret formulas and processes used at Golden belonged exclusively to plaintiff, and thus could not be lawfully disclosed by Herold; and, second, whether such disclosure had been made. The District Court found in favor of plaintiff on both propositions, and permanently enjoined defendants from disclosing or using "the whole or any part of the formulæ for manufacturing and producing either fireproof china cooking ware, or fireproof china or porcelain laboratory ware, or any knowledge or information relating thereto or connected therewith belonging to plaintiff, and which was developed and perfected by said Herold and became the property of and was used by the plaintiff."* The injunction also ran against the use of the "Semmler

formula in the form in which it was when communicated, surrendered, and delivered by said Herold to * * * the Guernsey Earthenware Company, and as it has since been perfected and improved upon, and as it existed at any stage when it was being tested and adapted by said Herold," as well as against making and selling "any fireproof china cooking ware or fireproof china or porcelain laboratory ware manufactured and produced by plaintiff from said Semmler formula, or any of the formulæ, so owned or used by the plaintiff"; also from representing or advertising that the Guernsey Company was making the same fireproof cooking and porcelain laboratory ware as made by plaintiff.

[1] 1. Plaintiff's secretary testified that, as part of the contract whereby Herold's plant was turned over to plaintiff, the former agreed to give to the latter, as its exclusive property, all his secret processes and formulas obtained by previous experimentation, as well as those he might thereafter discover while with plaintiff company. This testimony was taken in open court. There was other testimony more or less corroborative. The secretary also testified that in the month preceding Herold's employment by the Guernsey Company he informed that company's manager, Mr. Casey, of Herold's relations to plaintiff and the acquisition by the latter of Herold's secret processes and formulas. This testimony was doubtless believed by the District Judge, and we see no reason to question his conclusion on this feature of the case. A contract for plaintiff's exclusive ownership of the formulas and processes was, under the existing circumstance, not unnatural.

The rule is well settled that secret formulas and processes, such as are claimed to be involved here, are property rights which will be protected by injunction, not only as against those who attempt to disclose or use them in violation of confidential relations or contracts express or implied, but as against those who are participating in such attempt with knowledge of such confidential relations or contract, though they might in time have reached the same result by their own independent experiments or efforts. The following are among the leading cases supporting this rule: Morrison v. Moat, 9 Hare, 241; Peabody v. Norfolk, 98 Mass. 452, 96 Am. Dec. 664; O. & W. Thum Co. v. Tloczynski, 114 Mich. 149, 72 N. W. 140, 38 L. R. A. 200, 68 Am. St. Rep. 469, and cases there cited; Eastman Co. v. Reichenbach (Sup.) 20 N. Y. Supp. 110; Stone v. Grasselli Co., 65 N. J. Eq. 756, 55 Atl. 736, 63 L. R. A. 344, 103 Am. St. Rep. 794, and citations therein; Macbeth Co. v. Schnelbach, 239 Pa. 76, 86 Atl. 688. And see Pomeroy Ink Co. v. Pomeroy, 77 N. J. Eq. 293, 298, 299, 78 Atl. 698. We think the case made falls within the principle just stated. It follows that Herold had no right to disclose to the Guernsey Company the secret formulas and processes covered by the contract, and that, if he did make or threaten to make such disclosure, plaintiff was entitled to relief with respect thereto.

[2] 2. The question of disclosure presents greater difficulty. The circumstances immediately attending Herold's employment by the Guernsey Company strongly suggest such disclosure. Immediately upon his employment by that company, Herold was advertised as a

great find, a man with a national reputation as a ceramist. Simultaneously one of plaintiff's most important customers, which had given plaintiff a large order for porcelain ware, was applied to by the Guernsey Company for orders for the same kind of ware, and, on being told that it would be time enough to give orders when the Guernsey Company's samples were approved, replied that there was no question about production, that "Herold knows regarding costs and is familiar with the details of manufacture." Plaintiff accordingly lost the order. Plaintiff would seem to have been justified at the time it filed its bill in believing that Herold, who was by that time entirely out of harmony with, if not positively antagonistic to, plaintiff, had disclosed or was about to disclose its manufacturing secrets.

It developed on the trial that in his contract of employment with the Guernsey Company Herold had agreed to "constantly endeavor to improve the product and enlarge the variety of product in accordance with the policy of the company," and upon request, from time to time, to "communicate and demonstrate the formulas for any or all ware made in said factory, or known to or discovered or originated by him that may be available for said company, and keep a written record of all such formulas, and that such formulas and record [to] be a part of said company's private and secret record, and shall belong to said company only, and shall be kept secret from all others." As the factory referred to is evidently that of the defendant company, the agreement does not necessarily in terms call for a disclosure of the Golden formulas.

In the early summer of 1915 the Guernsey Company put on the market a line of porcelain ware of practically the same quality as plaintiff's. While there was no direct testimony of actual disclosure by Herold of plaintiff's secret processes and formulas, plaintiff's manager (Mr. Coors, Jr.), who succeeded Herold, and who had worked with the latter several months before Herold left plaintiff company, testified (by deposition taken out of court) to the existence of such formulas and processes, his knowledge of them derived from Herold, and that they related generally to the physical properties of the ingredients and the method of their preparation, the manner of applying the glaze to the pot, and the temperature in the firing kiln as relating to the composition of the body; also that the formulas, so far as written out by Herold, related only to the "percentage of the different sorts of clay that went into a given mix"; that the cards written out by Herold contained none of the secret processes, which, as again defined, were said to consist of "secret knowledge acquired by experience"—"methods and peculiarities which a man finds from time to time in the development." Further than this plaintiff refused to give or permit to be given any information of its claimed secret processes and formulas for which it asked protection. The witness further testified that, while all clays have different physical properties, the Golden process could be successfully used with the Ohio clays; that ware having the peculiar fireproof qualities of plaintiff's ware had not [before] been produced, and that the product ultimately put out by the Guernsey Company is identical in nature with plaintiff's latest product. There was other tes-

timony more or less corroborative of this testimony in some respects. If it be completely accepted, the court below was justified in giving plaintiff some measure of relief.

On the other hand, the testimony of nonuse and nondisclosure of plaintiff's alleged secret processes and formulas was overwhelming, if believed. Casey, the manager and principal owner of the Guernsey Company, is apparently a man of standing and affairs, as well as an expert potter of many years practical experience, a member of the American Ceramic Society and apparently interested in its publications. His standing as an expert has been recognized by his employment as such before the Board of Customs Appraisers, his appearance as an expert witness for the government in litigation over classifications and values, appearances before the Treasury Department and congressional committees, as well as consultation and working with government experts on development of pottery manufacture. He testified positively that he had never obtained any of plaintiff's claimed secrets from Herold or from any one else; that he never knew that Herold had or claimed to have secret processes, nor what plaintiff claimed its formulas or processes were; that he wished Herold's services as a superintendent on account of his supposed expertness a a potter; that Casey himself already had two formulas each for bodies and glazes, as well as a porcelain formula obtained from one Myers on August 28, 1914, from which latter formula satisfactory samples had already been made (porcelain seems not to have been produced by Myers commercially); that there are no secrets in pottery, except the formulas; that under Herold no new methods of manufacture were employed; and that both he and Herold worked in experimenting in the manufacture of porcelain. He claims to have in September, 1914, completed a costly addition to the plant, partly for the manufacture of porcelain laboratory ware, and to have exhibited to the trade samples of such ware in November following.

Herold, who, as before said, was a skillful ceramist, testified that there were at Golden no secret processes, as distinguished from formulas, unless as he perhaps may have meant that the secret processes involved merely mechanical skill and experience; that he used at the Guernsey Company no secret processes used at Golden; that the Golden secret related, not to the clay, but to an acid used in its treatment, and that the formula was in this respect secret so far as the Colorado clay was concerned; that the Colorado and Ohio clays were quite different; that no Colorado clay was used by the Guernsey Company; that at Golden there were used but two clays, together with a flint and a spar and one chemical; that at Guernsey there were used five clays, also a flint and a spar and two chemicals; and that the acid used at Golden could not be used at Guernsey, because it had the opposite effect on the Eastern clays.

Frauenfelter also testified that there were no secret processes in pottery, as distinguished from formulas; that the making of porcelain was practically a matter of experimentation; that the Semmler formula, which he claims to have obtained about November 15, 1914, and to have given to Herold in the latter part of the following January, was

a percentage formula of clays, feldspar, and flint, "given out in batch weights"; that he afterwards found that the Semmler formula was not secret, because "published in several works." He seemed willing to give the substance of the Semmler formula if desired; but plaintiff did not seem to desire it, possibly through fear it might by implication disclose plaintiff's formulas.

Brucker, Herold's brother-in-law, who had been with the latter at plaintiff's plant, and who went with him to the Guernsey Company, testified that the Golden formula covered the secrets at plaintiff's plant and related to the amounts of materials that went into the bodies and glazes and their mixing (to this extent partially corroborating plaintiff's present manager); that he did not know the chemical constituents of the ingredients used at either the Golden or the Guernsey plants, but that the "mixes" were not the same in the two plants; that at the Guernsey plant he knew the materials, but not the amounts, and at the Golden plant knew both materials and amounts; that at Golden there were but two clays, a flint and a spar, besides water and another chemical; and that at the Guernsey plant there were used five clays, a flint and a spar, water, and another chemical. (Of course, the mere fact that a change was made in the original formula, due to differences in clay available, would not necessarily prove that the Golden formulas or secret processes were not used.) He further testified that the Golden formula was changed by eliminating the acid after Herold left. (This latter statement seems not to have been denied, possibly through apprehension that denial would lead to a disclosure of the actual formula or process.) It further appeared by defendant's testimony that the perfection of the Guernsey Company's porcelain after Herold's acquisition was the result of long experimentation; 27 or more different experiments being tried by Herold before even approximately satisfactory results were obtained. This was perhaps due largely to differences in the clay available at Golden and at Cambridge respectively, to the differences in fuel used (coal at Golden, gas at Cambridge), and in the difference in atmospheric rarity at the respective places, due to altitude, and materially affecting the firing. There seems, also, to have been other difficulties in the way. The result was, according to defendant's testimony, that Herold had not succeeded in putting out porcelain for the Guernsey Company with complete commercial success. It appears, on the contrary, that kilns which under later operation netted $1,700 to $2,000, under Herold's operation netted but $300 to $400 each. In May, 1915, after about five months' service (perhaps four months after the injunction bill in this cause was filed), Herold severed his connection with the Guernsey Company, as did Frauenfelter. The Guernsey Company's first commercial porcelain was put out shortly after Herold left.

Manifestly the decree of the District Court entirely discredits the testimony of Casey, Herold, and Frauenfelter. Had the testimony of plaintiff's present manager been taken in open court,[1] and had both

---

[1] The witness testified very briefly on the hearing by way of rebuttal, as to a few items not important to our decision.

parties made full disclosure satisfactory to the trial court, of what plaintiff's claimed secret processes and formulas actually were, as well as the process employed by defendant (which the latter offered to disclose, provided plaintiff would disclose its own), we should probably be satisfied to adopt the conclusions of the District Judge, with possibly some modification. But the printed record of the testimony of the witness referred to is not entirely convincing, and the sharp conflict over the nature and extent of plaintiff's secret formulas and processes, and their comparison with defendant's methods—taking into account defendant's previous nearness to success and the competency of its manager, Casey, and the formulas already possessed—made disclosure thereof necessary, in our opinion, to a satisfactory decision. Without it the decree rests, we think, too largely on conjecture. The practical identity of ultimate product is not alone highly significant, inasmuch as even chemical analysis would not disclose either the original physical form of the ingredients used or the processes employed. We may add that no Colorado clay was used at the Guernsey plant as an ingredient of porcelain or china; that in modern porcelain manufacture generally clay, feldspar (one of the silicates of aluminium), and flint (silica) seem to be used; that different clays have different physical properties, which naturally affect the chemical combination; that the method of combining ingredients used so as to produce a satisfactory "mix" is an important problem; and that without knowing the process actually used it is impossible to know definitely how far they involve secret knowledge or information, as distinguished from mechanical skill and experience, as respects not only the "mix" but the glazing and firing.

The practice of making such disclosure in camera is well established. Taylor Co. v. Nichols, 73 N. J. Eq. 684, 689, 69 Atl. 186, 24 L. R. A. (N. S.) 933, 133 Am. St. Rep. 753. And disclosure can usually be made under such regulations on the part of the trial judge as will furnish reasonably adequate protection against publicity. Du Pont Powder Co. v. Masland, 244 U. S. 100, 37 Sup. Ct. 575, 61 L. Ed. 1016. Judge Sater recognized that "it would have been better, had there been a voluntary or compulsory disclosure in camera of what each party claims as a trade secret." We do not criticize plaintiff's unwillingness to have its formulas disclosed. It may have good reason to prefer the risk to its business from nondisclosure to the risk from disclosure. We base our action on the proposition that failure to make disclosure naturally impairs the weight of the testimony of plaintiff's manager; and in the absence of disclosure, especially in view of the limited acquaintance of the witness with pottery manufacturing processes before Herold left plaintiff's employ, we think the decree should not stand, except in one respect hereafter stated. Taylor Co. v. Nichols, supra; Baglin v. Cusenier (C. C. A. 2), 164 Fed. 25, 29, 90 C. C. A. 499. And see Sterling Varnish Co. v. Macon, 217 Pa. 7, 9, 66 Atl. 78.

We realize, however, that if plaintiff's claims are correct the equities are with it, and we shall therefore couple our reversal with a discretionary authority to the District Judge to entertain a motion on plaintiff's part (if such shall be made) for further hearing and the in-

troduction of further testimony on both sides, provided the application is accompanied by express offer to make and permit full disclosure (of course, in camera) of its alleged secret formulas and processes. We make this proviso because we realize that plaintiff may see nothing to be gained, at this stage of the case, by such disclosure. Defendant having offered below to disclose its processes and formulas (in camera), if plaintiff would do the same, and having obtained a reversal of the decree for want of such disclosure, could not well be heard to withdraw its consent.

This disposition makes it unnecessary to consider criticisms upon specific features of the decree, such as the running of the injunction against the use of the Semmler-formula, the disclosure or use (as construed by defendant) of Herold's mechanical skill and experience, or the failure to identify the processes and formulas enjoined. If no rehearing is had, they are not important; if had, the grounds of criticism may be removed.

The decree of the District Court is reversed, with costs, except so far as it enjoins the Guernsey Company from representing or advertising that it is making the same fireproof china cooking ware or fireproof china or porcelain laboratory ware as is made by plaintiff.