REIN et al. v. CLAYTON et al.

(Circuit Court, E. D. Michigan. January 12, 1889.)

PATENTS FOR INVENTIONS—INFRINGEMENT—INJUNCTION—BEFORE ISSUE OF PATENT.

A court of equity has no jurisdiction to enjoin the infringement of an invention before a patent has been issued, notwithstanding an application for the same has been made, and is still pending in the patent-office.

(Syllabus by the Court.)

In Equity. On motion for an injunction.

This was a bill to enjoin the use of an invention belonging to plaintiffs, for which they had not yet obtained a patent. The bill averred the plaintiffs to be the joint inventors and owners of an invention of an improvement in plumbers' and jewelers' furnaces, for which they had made application for a patent on September 11, 1888. A copy of the application, with the specifications, drawings, and claims, was annexed to the bill. The bill, which was filed October 11, 1888, further averred that the plaintiffs had been diligently prosecuting their application, which was still pending; that they were the original and first in-

ventors of said improvement; and that they were informed by their solicitors that the same was new and patentable. Following this were the usual averments of infringement.

*Alexander Brown*, for plaintiffs.

*George W. Radford*, for defendants.

BROWN, J. We are confronted upon the threshold of this case with the important question whether an inventor can maintain a bill for an injunction before the issue of a patent. The question has been directly decided in but a single case, viz., *Butler* v. *Ball*, 28 Fed. Rep. 754; and it is upon this case alone that plaintiffs rely for the maintenance of this suit. The learned judge, who delivered the opinion in this case, does not discuss the question upon principle, but cites two authorities as settling it in favor of the jurisdiction. The first case (*Evans* v. *Weiss*, 2 Wash. C. C. 342) was an action at law against a person who had made use of plaintiff's invention for some years prior to the passage of a special act granting him a patent for such invention, and the question was whether he was liable as an infringer, for using the improvement after he had received notice of the granting of plaintiff's patent; and the court held that he was, notwithstanding a proviso in the special act that "no person who shall have used the said improvements, or erected the same for use, before the issuing of said patent, shall be liable therefor." In delivering the opinion Mr. Justice WASHINGTON observed "that the right to the patent belongs to him who is the first inventor, even before the patent is granted; and therefore any person who, knowing that another is the first inventor, yet doubting whether that other will ever apply for a patent, proceeds to construct a machine, of which it may afterwards appear he is not the first inventor, acts at his peril, and with a full knowledge of the law that, by relation back to the first invention, a subsequent patent may cut him out of the use of the machine thus erected." It is entirely clear that in saying that the right to the patent belongs to the first inventor, even before the patent is granted, he refers only to the plaintiff's property in his invention, and his right to a patent therefor, and not to his right to enjoin an infringer before the patent is issued. The real question was whether the defendant, who had purchased the patented article before the patent was issued, and was then using it, had the right to continue to use it after the patent was granted, and it was held that he had not. The principle of this case was subsequently affirmed by the supreme court in *Evans* v. *Jordan*, 9 Cranch, 199. In the other case, also, (*Jones* v. *Sewall*, 6 Fish. Pat. Cas. 343,) suit was brought upon letters patent, and in opening his opinion Mr. Justice CLIFFORD made the incidental remark that inventions lawfully secured by letters patent are the property of the inventors, and as much entitled to legal protection as any other species of property. "They are indeed property, even before they are patented, and continue to be such, even without that protection, until the inventor abandons the same to the public, unless he suffers the patented product to be in public use or on sale, with his consent and allowance, for more than two

years before he files his application." He is evidently speaking here of the right of an inventor to a patent in case he makes his application within two years after his device has been made public; and this right is a species of property which remains unimpaired during the continuance of the two years. But there is no intimation here that the inventor may apply for an injunction before his right is lawfully secured by letters patent; indeed, the intimation is the other way. He is evidently speaking of the same right of property to which Mr. Justice HUNT alludes in *Manufacturing Co.* v. *Vulcanite Co.*, 13 Blatchf. 375, 383: "So far as the plaintiff's own use or manufacture is concerned, it needs no act of congress to enable it to make, use, and vend the article, and it obtains no such right from congress. The benefit of the patent law is that the plaintiff may prevent others from making, using, or vending its invention. To itself, to its own right to make, use, or vend, no right or authority is added by those statutes." We think that neither of these cases is authority for the proposition laid down in the case of *Butler* v. *Ball.*

Let us now examine the question upon principle. At common law there was no special property in an invention, because the policy of the law was opposed to this as to all other monopolies. Walk. Pat. § 159. Indeed, the inventive genius of the English-speaking people did not begin to manifest itself to any considerable extent before the middle of the last century, and it is only within the past 60 years that the business of the patent-office has been considered of any great importance. Patents for inventions were at first treated as a royal prerogative, and granted as a matter of favor, and never as a legal right. They were in fact a branch of that extensive system of monopolies which became so odious during the reign of Elizabeth and her successors, the Stuarts. In the reign of James I. a statute known as the "Statute of Monopolies" was passed, declaring all monopolies contrary to law, and void, except as to patents, not exceeding the grant of 14 years, to authors of new inventions, and some others not material to be noticed here. This was the earliest recognition of the right of an inventor to a monopoly of the manufacture, sale, and use of his invention. It still remained, however, a royal prerogative, which was granted or refused at the pleasure of the crown. This statute was followed by others, securing to the inventor a monopoly, as a matter of right, and providing the proper machinery for procuring and enforcing it. In this country patents have been recognized as existing only by virtue of positive law. The constitution of the United States conferred upon congress the power "to promote the progress of science and useful art by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries." The adoption of the constitution was followed the next year by the first federal statute upon the subject, which became the foundation of the patent law of this country. That the right of an inventor to a monopoly is purely a feature of the statute was recognized by the supreme court in *Brown* v. *Duchesne*, 19 How. 183, 195, in which Mr. Chief Justice TANEY observed:

"But the right of property which the patentee has in his invention, and his right to its exclusive use, is derived altogether from these statutory provisions; and this court have always held that an inventor has no right of property in his invention, upon which he can maintain a suit, unless he obtains a patent for it, according to the acts of congress; and that his rights are to be regulated and measured by these laws, and cannot go beyond them."

Still stronger language is used by him in *Gayler* v. *Wilder*, 10 How. 477, 493, in which he says:

"The inventor of a new and useful improvement certainly has no exclusive right to it, until he obtains a patent. This right is created by the patent, and no suit can be maintained by the inventor against any one for using it before the patent is issued. But the discoverer of a new and useful improvement is vested by law with an inchoate right to its exclusive use, which he may perfect and make absolute by proceeding in the manner the law requires. * * * The monopoly did not exist at common law, and the rights, therefore, which may be exercised under it, cannot be regulated by the rules of the common law. It is created by the act of congress; and no rights can be acquired in it unless authorized by statute, and in the manner the statute prescribes."

And in the recent unreported case of *Marsh* v. *Nichols*, [9 Sup. Ct. Rep. 168, 15 Fed. Rep. 914,] appealed from this court, in which the point decided was that a patent not signed by the secretary of the interior is absolutely void, it is said:

"The invention is the product of the inventor's brain, and, if made known, would be made subject to the use of any one, if that use were not secured to him. Such security is afforded by the act of congress, when his priority of invention is established by the officers of the patent-office, and the patent is issued. The patent is the evidence of his exclusive right to his use of the invention. It therefore may be said to create a property interest in that invention. Until the patent is issued, there is no property right in it; that is, no such right as the inventor can enforce. Until then there is no power over its use, which is one of the elements of a right of property in anything capable of ownership."

A similar observation was made by Judge SHEPLEY in *Machine Co.* v. *Tool Co.*, 4 Fish. Pat. Cas. 284, 294. "An inventor," says he, "has no right to his invention at common law. He has no right of property in it originally. The right which he derives is the creature of statute and of grant." See, also, *Sargent* v. *Seagrave*, 2 Curt. 553, 555.

The power of a court to deal with patents is now regulated by the fifty-fifth section of the patent act of 1870, incorporated into Rev. St. § 4921, which declares that "the several courts vested with jurisdiction of cases arising under the patent laws shall have power to grant injunctions, according to the course and principles of the courts of equity, to prevent violation of any rights *secured by patent*, on such terms as the court may deem reasonable." It is impossible to deduce from this language any recognition of a power to grant such injunction before the right has been "secured by patent." Indeed, if it does not absolutely inhibit that power, it points very strongly in that direction. While no court has decided that it would not grant an injunction after application for but prior to the issue of a patent, it has been frequently held that after a patent has been surrendered no action will lie upon it, and all actions founded upon it

abate, notwithstanding an application for a reissue for the same be pending. *Moffitt* v. *Garr*, 1 Black, 273; *Peck* v. *Collins*, 103 U. S. 664. This particular defect has since been remedied by the act of 1870, declaring that the surrender shall take effect upon the issue of the amended patent, but the principle of these decisions is not affected. Now, if a bill will not lie upon a patent surrendered, though an application for a reissue be pending, it is impossible to see upon what ground it can be sustained before any patent whatever has been issued.

There are also certain practical difficulties in the way of assuming jurisdiction of a bill like the one under consideration. Courts of justice have no original cognizance of the subject of inventions. Congress has provided a commissioner of patents, has furnished him with a library of such scientific works and periodicals, both foreign and American, as may aid him in the discharge of his duties, with copies of models of all patents heretofore granted, together with a large corps of intelligent and experienced assistants, whose duty it is to examine every application; to compare it with patents previously issued, (that two may not be issued for the same invention;) to correct the specifications and claims; to give notice to the patentee of interferences; and to determine questions of priority between rival inventors of the same device. It is a matter of common knowledge that the commissioner is in the habit of limiting, altering, and expunging claims, and that it is impossible to say, after the specifications and claims have been filed, in what shape, and with what limitations, they will emerge from the patent-office. It is absolutely impossible for courts of justice to deal with questions of this description. We are asked in this case to assume that a patent will be issued covering five different claims, yet we have no assurance whatever that, if a patent be issued, any one of these claims will be allowed in the language in which it is couched. Besides, the effect of assuming cognizance of a patent before the patent is granted would be to extend the life of the patent beyond the statutory period of 17 years, by the time, which may be months, and even years, during which the application is pending in the patent-office.

The jurisdiction of courts to determine the validity of patents is purely appellate. It is conferred upon the theory that, application for patents being made *ex parte*, in the pressure of business, patents may be granted by inadvertence or mistake, or rival claimants may not have an opportunity of being heard; and because there is no other method provided by law of determining whether persons using similar devices are or are not infringers upon the rights of the patentee. It is obvious that when parties are represented by experienced counsel, and witnesses are examined with that care and deliberation which is only attainable in judicial proceedings, a correct result is much more likely to be reached than upon the hurried examination of an examiner in the patent-office. These considerations, however, do not by any means justify us in anticipating his decision, or intermeddling in any way with his action before it has been consummated by the issuance or refusal of the patent.

A decree will therefore be entered denying the injunction, and dismissing the bill for want of jurisdiction.