B. F. GLADDING & CO., Inc.,
Plaintiff,

v.

SCIENTIFIC ANGLERS, Inc.,
Defendant.

No. 1470.

United States District Court
E. D. Michigan, N. D.

March 9, 1956.

Opinion Amended May 18, 1956.
See 141 F.Supp. 630.

---

Theodore E. Simonton, Cazenovia, N. Y., for plaintiff.

Laurence, Vanderkelen & Miller, Saint Johns, Mich., for defendant.

PICARD, District Judge.

Action for specific performance of a contract, alleged violation of trade secrets and elimination of unfair competition.

### Findings of Fact

Plaintiff, B. F. Gladding & Company, Inc., is a New York corporation with its main office at South Otselic, New York, while defendant, Scientific Anglers, Inc., is a Michigan corporation with its main office at Midland, Michigan. For a number of years Gladding has been a manufacturer of fishing lines. It is an old family concern and was closely held for over one hundred years, now has about 110 employees and within the last ten years has had some shifting among the management although some descendants of the original family are still connected therewith. Scientific Anglers, Inc., on the other hand was incorporated in 1946 with Leon P. Martuch as president and Clare S. Harris, vice-president, secretary and treasurer. The only full time employee is Mr. Martuch who graduated from the eighth grade, was a pressman and through his interest in fishing finally got into this type of business. Mr. Harris is a graduate mechanical engineer employed by the Dow Chemical Company. O. R. McIntire and Norman R. Peterson are skilled chemists of Dow and are directors of defendant.

Up to the time of this contract and beginning with about 1947, plaintiff became the sole distributor of certain fishing line coating products then being made and sold by Scientific, the precise formula of which was not entirely known to Gladding. After some preliminary exchange of letters, telephone calls and visits, the agreement of December 1, 1950 was executed. We will not quote the complete agreement except paragraphs 2, 9 and 10, which are as follows:

"2. Gladding hereby agrees to employ Scientific for the term of this agreement, as consulting engineers for Gladding engaged in working on such of the development, engineering, production and marketing problems of Gladding as may from time to time be assigned to Scientific, and Scientific hereby accepts such employment. Gladding understands the other activities of the several employees of Scientific, and Gladding will not make unreasonable demands over long periods of time on Scientific's personnel. Approximately six (6) trips a year from Midland to South Otselic may reasonably be required of Scientific, the reasonable out-of-pocket expenses of such trips to be borne by Gladding. Gladding is to pay Scientific a quarterly fee of Twenty-five Hundred Dollars ($2500.00), payable in advance for each quarter, except that the payment for the first period shall be Three Thousand Three Hundred and Thirty-three dollars and thirty-three cents ($3,333.33) and shall cover the four (4) months ending March 31, 1951 and shall be paid forthwith upon the execution and delivery of this agreement. It is expressly understood and agreed that Scientific will not do work similar to that which it is to do for Gladding for any other manufacturer of fishing lines and other products that are related to Gladding's business, during the term of this agreement, whether on a consulting basis or otherwise."

"9. Nothing contained in this agreement shall prevent Scientific from working upon any projects relating, directly or indirectly, to the manufacture of fishing products other than the projects which may be undertaken by Scientific for Gladding pursuant to Article 2 hereof. Scientific agrees that Gladding shall have the first refusal of rights under any inventions, discoveries and improvements made by

Scientific heretofore or hereafter during the term of this agreement relating, directly or indirectly, to the manufacture of fishing products, and not arising out of the work done by Scientific for Gladding pursuant to the provisions of Article 2 hereof. To this end, Scientific shall promptly furnish Gladding with a copy of any patent application filed thereon, and Gladding shall thereupon advise Scientific in writing within three (3) months from the receipt of such application copy, as to whether or not it is interested in negotiating with respect to the acquisition of rights thereunder. In the event that Gladding is not so interested, nothing contained in this agreement shall prevent Scientific from proceeding to attempt to exploit said rejected inventions, discoveries and improvements through other manufacturers of fishing products or otherwise. In the event that Gladding is so interested, negotiations shall proceed with all reasonable dispatch, and in the event of failure to reach an agreement within a reasonable time, Scientific shall have the right, after thirty (30) days' notice in writing to Gladding of its intention so to do, to attempt to exploit any inventions, discoveries and improvements upon which negotiations have thus failed through other manufacturers of fishing products or otherwise. It is expressly understood and agreed that in any such negotiations Scientific will not request a royalty rate greater than five per cent (5%) of net sales."

"10. Any inventions, discoveries and improvements made by Scientific during the term of this agreement and arising out of work done by Scientific for Gladding pursuant to the provisions of Article 2 hereof, shall be promptly disclosed in writing by Scientific to Gladding, and Gladding shall have a non-ex-clusive, royalty-free license or shop right to make, use and sell the same in connection with its business, such license or shop right to be non-assignable save to the purchaser of substantially all of Gladding's fish line business. Scientific agrees promptly to furnish Gladding with a copy of any patent application filed by it on any inventions, discoveries and improvements thus arising out of its employment by Gladding, and Gladding shall have the first refusal of exclusive rights thereunder, and negotiations to that end shall be conducted in the manner set forth in Article 9 hereof."

Both parties agree that paragraph 11 does not apply to the facts in this case.

It must be noted that this was a yearly renewal contract and that Scientific was to serve Gladding exclusively as consulting engineer on any

"development, engineering, production and marketing problems"

assigned to it by Gladding. In return Scientific was to receive a $10,000 yearly fee out of which it paid its own expenses. Other provisions made available to each party whatever test data was compiled by either and Scientific was to disclose to Gladding the composition and method of manufacture of all products developed by it and sold by plaintiff. Gladding was also given the exclusive right to purchase for use or resale all products, apparatuses and processes developed by Scientific which pertained to fishing lines. It was specifically recognized that within the course of their endeavors each would necessarily become intimately acquainted with the other's business and because of that possibility each agreed not to disclose the other's trade secrets or other information which it might learn, to any other unauthorized person.

Paragraphs 9 and 10 we believe are the most important parts of this contract. By paragraph 9 Scientific had the right to work on any other products relating directly or indirectly to the

manufacture of fishing products other than projects referred to it by Gladding and defendant agreed that Gladding should have first refusal of rights under any inventions, discoveries and improvements to such fishing products made by defendant. Scientific was also to furnish Gladding with a copy of any patent applications it might make and if Gladding was interested in acquiring rights thereunder it had to notify Scientific within three months. If it didn't Scientific was free to dispose of patents and patent rights free and clear from any obligation to Gladding.

There is also a provision in paragraph 9 that Scientific could not require Gladding to pay a royalty greater than five per cent of net sales, and it is the claim of both parties that this is the paragraph that governs the facts at bar, except that defendant claims that since Gladding has failed to negotiate for such rights, Scientific may proceed to dispose of its patent rights entirely as it desires with Gladding losing all priorities.

Diverting attention from the provisions of the contract itself we find that during the existence of that contract a fishing line was developed chiefly by Scientific which is now being sold by Gladding under the trade name of "Aerofloat" and by Scientific under the trade name of "Air Cel". The outstanding feature of "Air Cel" and "Aerofloat" is the presence of numerous gas bubbles beneath the coating on the line, which permits the fishing line to float upon the top of the water.

Plaintiff claims all rights to this new bubble line, chiefly on the theory that defendant was its employee during development of the bubble line and that this entire bubble line project was one referred to Scientific by plaintiff. On the other hand, Scientific claims all rights (except shop rights to Gladding) because it claims that all negotiations between the parties failed, and it also holds that the bubble line is entirely Scientific's own invention. Plaintiff is also fearful its "trade secrets" are going to be revealed.

Here are some additional facts that we hereby determine.

While doing some work in the early part of 1953 in connection with a project referred to it under paragraph 2 of the December 1, 1950 contract, defendant suddenly found it had a fishing line which had "bubbles". Defendant's Martuch looked upon the presence of bubbles as something undesirable and to be eliminated but Mrs. Coleman, of plaintiff's concern, saw possibilities in a "bubble" line and urged its development. The parties then jointly started upon perfecting the bubble line which required the use of some of the alleged trade secrets of both parties. This covered the primer coat, plastisol, automatically controlled variable orifice die until finally in August 1953 the line, much in its present form, was ready for exhibition by plaintiff at a convention in Chicago. Defendant was also at the Chicago convention and helped with the exhibit. After the convention defendant brought the exhibit plus the apparatus necessary to manufacture the bubble line, including the "tower", back to Midland and then to plaintiff's plant in New York, where in September plaintiff started to put "bubble lines" on the market. Then came dissention between the parties, plaintiff acting to discontinue the contract in late 1953, although an attempt at reconciliation was made in January 1954.

Insofar as the bubble line is concerned it is our finding that no trade secrets exclusively belonging to plaintiff are included in the bubble line as manufactured in the finished products or through the patents applied for. Any trade secrets existing are either those developed by defendant alone or by both defendant and plaintiff. We further find that while both parties loudly voice claims of extreme rights under the facts and interpretation of the contract as claimed, this court has gained the impression that neither party is overly sin-

cere about those claims and that the questions of trade secrets, illegality of contract, scientific formulae, who is the inventor, etc. may to some extent be brushed aside.

In any event this court finds that either paragraphs 9, 10 or 11 of the contract must apply in deciding this case and after reading the record has come to the conclusion that the bubble line resulted from a project assigned to Scientific by plaintiff under paragraph 2 of the contract and not only does paragraph 10 govern but that the parties so interpreted the contract up to the time of this litigation. For example, both parties have agreed that plaintiff shall have "shop rights" or at least would have had and the only paragraph giving plaintiff shop rights is paragraph 10. And right from the start plaintiff insisted upon and received a "shop right" in the bubble line patent application, a right often conceded by defendant in its pleadings, briefs, and in open court. The difference of the parties and the rub, inter alia, resolves itself to certain rights claimed by defendant under that paragraph 10 to the effect that Scientific was permitted to add certain negotiating conditions on exclusive rights, not specifically set out in the contract.

We also find these further facts—

(1) that plaintiff is the holder of shop rights in said patents;

(2) that there is nothing in this contract that renders it illegal in the State of Michigan;

(3) that Scientific was an independent contractor not an "employee" within the patent law understanding of the word "employee";

(4) that the December 1, 1950 contract was negotiated by two corporations dealing at arm's length;

(5) that if there had been proper negotiations, which we determine were not had, and plaintiff had failed to agree to pay a maximum 5 per cent of net sales royalty, then Scientific could re- fuse Gladding exclusive rights and could bargain elsewhere for the sale or lease of its patents or continue under its own patents;

(6) that the contract covered patentable and unpatentable improvements and inventions;

(7) that the bubble line was a joint development to which both parties made substantial contributions;

(8) that this court will not consider whether Leon P. Martuch, alone or with Clare S. Harris, is or are the inventor or inventors of the variable die application and that plaintiff is estopped to deny the Martuch claim at the present time;

(9) that Section 445.761 Compiled Laws of Michigan has no application to the case at bar; and

(10) that paragraph 10 includes the orifice die and the bubble line improvement and invention whether patentable or not.

### Conclusions of Law

In this opinion it is necessary to mix the Findings of Fact with Conclusions of Law as has been done to some extent above but nevertheless we add citations as to a few matters.

As to whether defendant was an "employee".

We recognize that in United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, an invention made by an employee is the property of his employer but there is a distinction between a contract of employment to invent and one to devise and make improvements. In the latter relationship the inventions of the employee though performed during the period of the contract are the property of the employee, not the employer. In United States v. Dubilier Condenser Corp., supra, the Supreme Court, 289 U.S. at page 187, 53 S.Ct. at page 557, quoting from Dalzell v. Dueber Watch-Case Mfg. Co., 149 U.S. 315, 13 S.Ct. 886, 37 L.Ed. 749, said—

" 'But a manufacturing corporation which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so employed, in the absence of express agreement to that effect.' "

■ Here Scientific was not employed to "invent" and if it did "invent" the contract covered such invention.

As for trade secrets.

■ We recognize that trade secrets may be the subject of property rights entitled to protection; (see A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531) that if an employee has gained knowledge of his employer's trade secrets he will not be permitted to disclose or make use of the same where he has agreed not to do so. H. B. Wiggins Sons' Co. v. Colt-A-Lapp Co., C.C., 169 F. 150. It has also been held that even in the absence of an express agreement to refrain from disclosure the same will be implied. O. & W. Thum Co. v. Tloczynski, 114 Mich. 149, at page 157, 72 N.W. 140, 38 L.R.A. 200; Williston on Contracts, Revised Edition, Vol. 5, Section 1646 p. 4624.

■ These are some convincing authorities in favor of Gladding but one salient point in the case at bar distinguishes it from the authorities above cited. When the relationship and rights of parties are governed by a written contract nothing is to be implied where the intent of the parties is clear or where covered by an express provision. Johnson v. Igleheart Bros., 7 Cir., 95 F.2d 4, at page 9; Emigrant Industrial Savings Bank v. One Hundred Eight West Forty Ninth Street Corp., 255 App.Div. 570, 8 N.Y.S.2d 354; Godfrey v. Newman, 135 Misc. 764, 239 N.Y.S. 585; 17 C.J.S., Contracts, § 328, pages 779, 780. The contract here is not ambiguous.

As to interpretation of contract.

■ Inquiry, therefore, must be made as to what parties intended concerning products, processes and apparatus developed by Gladding and Scientific acting in concert. The contract must be determined by all its provisions. Halsted v. Globe Indemnity Co., 258 N.Y. 176, 179 N.E. 376.

"A contract must be construed as a whole and the intention of the parties is to be collected from the entire instrument, and not from detached portions; it being necessary to consider all of its parts in order to determine the meaning of every particular part as well as of the whole." Victory Bottle Capping Mach. Co. v. O. & J. Mach. Co., 1 Cir., 280 F. 753, at page 759.

■ Nothing in the contract gives ownership to either plaintiff or defendant and it doesn't provide that Scientific shall not use the developments. The restriction in paragraph 8 is against disclosure of unauthorized persons. Paragraphs 9 and 10, however, do cover the subject matter and we conclude that the parties intended that under these facts both parties were to control the fruits of their efforts. In addition we find that no exclusive trade secrets of plaintiff are being used.

On the terms of negotiating:

■ Usually if a person has title to a patent and someone desires to purchase the same, the vendor can make whatever terms it desires, and until this court became acquainted with all the facts in this case we were under the impression that the defendant would be able to make such terms here. We so expressed ourselves. However, after reading the contract as a whole, the testimony as submitted together with the exhibits, we can find nothing in that contract giving defendant the right to say that there shall be a minimum or maximum of these bubble lines to be paid for by plaintiff in any one year and defendant had no right to condition its negotiation on such a premise.

Article 9 sets out all the terms of procedure plaintiff has to comply with

in order to have an exclusive right to any and all patents developed or inventions made under paragraph 10. Among these conditions was the requirement to pay a royalty up to the 5 per cent of net sales as outlined in paragraph 9. That was the intention of the parties.

Since the other points of law raised are apparently now immaterial we do not discuss them. Our conclusion is that the terms and provisions of paragraph 9 cover the negotiations for paragraph 10 and that unless plaintiff is willing on or before April 14, 1956, to meet a royalty charge up to 5 per cent, based on its net sales of the bubble line, that it no longer shall have any rights in those patents applied for or in any way interfere with the obtaining of them.

The injunction heretofore issued will continue until April 14, 1956 and thereafter if Gladding meets the terms of paragraph 9, but defendant, on its part, refuses to comply therewith.